**Walter J. REES, Plaintiff-Appellee,**

v.

**BANK BUILDING AND EQUIPMENT CORPORATION OF AMERICA, a Corporation, Defendant-Appellant.**

**No. 14231.**

United States Court of Appeals
Seventh Circuit.

May 25, 1964.

Rehearing Denied June 24, 1964.

Frederic H. Stafford, Donald N. Clausen, John P. Gorman, Jacob T. Pincus, Clausen, Hirsh, Miller & Gorman, Chicago, Ill., for defendant-appellant.

James P. Chapman, Lee A. Freeman, Chicago, Ill., for appellee.

Before DUFFY, SCHNACKENBERG and CASTLE, Circuit Judges.

CASTLE, Circuit Judge.

The defendant-appellant, Bank Building and Equipment Corporation of America,[1] prosecutes this appeal from a judgment against it for $39,000.00 entered by the District Court on a jury verdict awarding damages in that amount to Walter J. Rees, plaintiff-appellee. The liability asserted against Bank Building in the plaintiff's action is predicated upon an alleged termination of plaintiff's employment with Bank Building wrongfully, without cause and in bad faith in an attempt to deprive him of commissions which would accrue to him.

The main issues precipitated by Bank Building's appeal are whether, as a matter of law, the provisions of a compensation agreement relating to plaintiff's em-

---

1. Sometimes referred to herein as "Bank Building".

**550**

ployment preclude recovery by plaintiff, and, if not, whether the evidence and the inferences which may reasonably be drawn therefrom, when considered in the light most favorable to the plaintiff, support the jury's verdict. These two issues permeate Bank Building's contentions that the district court erred in failing to grant its motions for a directed verdict both at the close of plaintiff's evidence and at the close of all the evidence, and erred in the giving and in the refusing to give certain instructions. Appellant also asserts that the court erred in admitting an exhibit in evidence.

The record discloses that Bank Building engages in the business of furnishing architectural and consulting services, of acting as a general contractor, and of acting as a supplier of fixtures and equipment, in connection with the construction or remodeling of the facilities of banks and other financial institutions. It maintains a large staff consisting of executives sales analysts or salesmen, architects, designers, cost estimators, decorators and others. On February 28, 1956, it employed plaintiff as a sales analyst or salesman-representative to sell its services and negotiate and have executed architectural, building and fixture contracts. The employment was for no fixed duration. A compensation agreement executed by the parties provided for regular semi-monthly payments or advancements of $208.00 to the plaintiff to be charged against commissions earned by him under the terms of a schedule[2] governing commission rates and condi-

tions. The compensation agreement further provided:

"Should the employee leave the company voluntarily, or at the request of the company, final accounting and settlement shall be made within 30 days after such separation. The employee shall be paid in full the commission or other compensation due him in accordance with the terms of this agreement for those portions of work authorized at the time of separation as follows:

"Commissions on Building and Fixture Contracts at established rates on the original contract and Fixture Extras secured up to the time of separation.

"Commission on Architectural contracts at established rates on the actual or estimated fee to be paid by the owner upon completion of the authorized stage of work. (Preliminary, Working Drawing or Final.) No compensation is to be paid on the unauthorized portion of architectural work."

In the summer of 1956 plaintiff represented Bank Building in preliminary consultations and the signing of consultant and architectural agreements in connection with a drive-in facility for the American National Bank of St. Paul, St. Paul, Minnesota. Negotiations and consultations with American continued and were expanded to encompass either the erection of a new bank building or the remodeling of its existing building. In May of 1957, Bank Building in re-

2. Under the provisions of the commission schedule the plaintiff, as a salesman, was entitled to commission credits computed on the basis of percentages specified for salesmen conditioned in substance, as follows:

(a) when the client approved the preliminary plans, the salesman's percentage on 25% of Bank Building's architectural-consultant fee;

(b) when the client authorized preparation of working drawings, upon client's approval of such drawings, the salesman's percentage on the next 50% of the total architectural-consultant fee;

(c) upon preparation of final plans, and the client's approval thereof, the salesman's percentage on the final 25% of the architectural-consultant fee;

(d) when the building contract was received, signed by the client, the salesman's percentage of Bank Building's total fee as general contractor;

(e) when authorization or contract of client for fixtures or equipment was received, the salesman's percentage of the total sale price.

sponse to an inquiry from Bell Savings & Loan Association, Chicago, Illinois, sent plaintiff to interview Bell's officers in connection with a proposed expansion of Bell's facilities. In addition to his other activities in behalf of Bank Building, plaintiff worked continuously and extensively on these two projects for over two years, devoting over 35% of his time to them. They culminated in building contracts involving substantial amounts. The estimated overall cost on the American contract exceeded two million dollars. The evidence warrants a conclusion that prior to plaintiff's discharge each of these clients was fully committed to the projects involved, expected Bank Building to do the work, and that the delays encountered were attributable to the client's consideration of alternative proposals presented, the obtaining of space necessary for the expansion involved, and other factors involving no uncertainty as to the decision to proceed with the project or as to whether Bank Building would be engaged to do the further work in completion of the project.

The plaintiff was discharged effective August 15, 1958. On the American job, the plaintiff received commission credit covering the architectural and building contracts on the drive-in facility, and on the preliminary architectural work for building remodeling. On the Bell job, plaintiff received commission credit on the preliminary architectural work. The $39,000.00 awarded by the jury's verdict, and in the judgment entered on the verdict, does not exceed a salesman's commission, computed according to the governing schedule, on the work authorized and contracts entered into on these two projects subsequent to plaintiff's discharge. Such work included the balance of the architectural work and the building and fixture contracts on the American project, and the balance of the architectural work and the building contract on the Bell project.

Appellant contends that the provisions of the compensation agreement quoted *supra* limit the plaintiff's right to com-mission in event of his leaving its employ "at the request of the company" and that he has been fully compensated or credited under the standards expressly set forth in the agreement which limit such commissions to work under contract or client authorization "at the time of separation". Appellant contends, in substance, that the express provisions of the compensation agreement must be literally applied and that, as a matter of law, it is of no consequence whether the discharge of the plaintiff was without cause, in bad faith, and for the purpose of depriving him of the commissions which would accrue on formal authorization of the balance of the work contemplated, with reasonable certainty, on the two projects.

The court, of course, was without power to remake or alter the contract of the parties. We are of the opinion that it did not do so, but in its rulings and instructions merely determined that the contract limitations did not apply to the situation presented by the evidence. And we perceive no error in that determination. Although the contract language evinces a meeting of the minds of the parties as to the commissions to be paid or credited in the event plaintiff voluntarily left the employ of the company or was discharged for cause it can hardly be assumed from the language employed that a bad faith discharge, without cause, and for the purpose of depriving plaintiff of commissions reasonably certain to accrue to him, was within the mutual contemplation of the parties.

The effect of an express provision authorizing a discharge without cause has been recognized by the jurisdiction (Missouri) whose law as to substantive matters it is agreed must be applied in this case. Croskey v. Kroger Co., Mo.App., 259 S.W.2d 408, 412; Spencer v. General Electric Company, 8 Cir., 243 F.2d 934. But we are of the view that in the absence of such a provision there is no basis, in the instant case, for rejecting the general principle which implies a requirement that a principal

deal fairly with his agent. Such principle is stated in 17A C.J.S. Contracts § 328, pp. 284–286, as follows:

"Moreover, in every contract there exists an implied covenant of good faith and fair dealing; and, more specifically, under such rule, the law will imply an agreement to refrain from doing anything which will destroy or injure the other party's right to receive the fruits of the contract."

And, although there are factors which serve to distinguish Beebe v. Columbia Axle Co., 233 Mo.App. 212, 117 S.W.2d 624 and Glover v. Henderson, 120 Mo. 367, 25 S.W. 175, from the precise situation here involved, these decisions, relied upon by the plaintiff, do represent in effect a recognition and application of the "good faith and fair dealing" principle by the Missouri courts in situations somewhat similar to that here involved albeit the factual situations presented did not admit of relief identical to that granted in the instant action. The rationale of those decisions in our judgment requires application of the "good faith and fair dealing" doctrine here. See also: Fargo Glass & Paint Co. v. Globe American Corporation, 7 Cir., 161 F.2d 811.

■ We conclude that the District Court did not err in the legal criteria it applied in denying appellant's motions for directed verdict and in the giving and refusing of instructions. It is our further conclusion that on the record before us the factual considerations involved in the resolution of the questions as to whether cause existed for plaintiff's discharge, whether at the time of his separation it was reasonably certain that Bank Building would receive the contracts and authorizations for the balance of the work on the American and Bell projects, and whether plaintiff's employment was terminated in bad faith in an attempt to deprive him of commissions to accrue on the remaining work, were all for resolution by the jury. And there is substantial support in the record for the conclusions on these factual issues which are implicit in the jury's verdict. We see no purpose to be gained by detailing that evidence here.

■■ We have considered appellant's contention that the court erred in admitting in evidence, over appellant's objection, a report of appellant's district sales manager dated June 19, 1958, summarizing an interview with Bell's vice-president in which the latter is reported to have expressed Bell's desire that Bank Building do the entire job. The report was admissible on the issue of Bank Building's belief as to whether it was reasonably certain to receive the additional and remaining work on the project albeit it expressed a conclusion of the district sales manager rather than a verbatim recital of the statement made by the Bell executive. Moreover, both the district sales manager and the Bell vice-president testified at the trial as to the conversation involved. Under such circumstances the admission of the exhibit in question cannot be regarded as error requiring a reversal.

The judgment order of the District Court is affirmed.

Affirmed.

SCHNACKENBERG, Circuit Judge (dissenting).

It is axiomatic that "hard cases make bad law". Black's Law Dictionary (3rd Edn.) p. 876. In the case at bar the district court, in endeavoring to give relief to plaintiff, has probably made a new contract for the parties. Under the contract which really existed between the parties, plaintiff was entitled to commission credits on architectural services which had actually been *authorized* by Bell Savings and Loan Association and American National Bank of St. Paul. However the district court, by a process of interpretation, in effect extended the contractual rights of plaintiff in such a manner as to obliterate the importance of the prerequisite of authorization.